Thompson Yards, Incorporated v. Commissioner.
Thompson Yards, Inc. v. Commissioner
Docket No. 109834.
United States Tax Court
1943 Tax Ct. Memo LEXIS 397; 1 T.C.M. (CCH) 822; T.C.M. (RIA) 43142; March 22, 1943
*397 Wayne C. Gilbert, Esq., for the petitioner. Edward C. Adams, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: By this proceeding petitioner challenges respondent's determination of deficiencies in its income tax as follows: 1937
$ 84.48
January 1, 1938, to November 30, 1938
1,094.78
Fiscal year ended November 30, 1939
632.57
The only presently contested issue is whether certain real estate which petitioner sold during its fiscal year ended November 30, 1939, was a capital asset within the meaning of Revenue Act of 1938, section 117 (a) (1), [1] by reason of not being "held by" it "primarily for sale to customers in the ordinary course of * * * [its] trade or business." *398 Facts have been stipulated which concededly sustain the deficiencies for the other periods. Findings of Fact The stipulated facts are hereby found. Only so much of them as are pertinent to the determination of the contested issue will hereinafter appear. The remaining facts are otherwise found from the record. Petitioner is a corporation organized under the laws of Minnesota. It filed its Federal income tax returns for the periods in question with the collector for the District of Minnesota. Its original articles of incorporation stated that the general nature of its business was to deal in lumber and all kinds of wood products, building material, fuel, farming equipment, and merchandise; "to purchase, own, sell, lease, mortgage or otherwise dispose of any real or personal property, * * * when it may be necessary or proper so to do in connection with the other business of the corporation, and generally do any and all business properly incident to the specific business hereinbefore mentioned." The articles of incorporation were amended July 2, 1929, the nature of Petitioner's business being extended to include the construction, alteration, decoration, furnishing, setting up and/or *399 improving "buildings of every sort and kind and/or other structures." In its Federal income tax returns for the periods in question, petitioner described its business as "retail lumber" or "retail lumber, building material and fuel." Petitioner did not indicate its business classification in that part of the returns requesting such information. The returns filed for the periods involved indicate that petitioner had gross annual sales of lumber aggregating approximately $3,300,000; that it received annual interest of between $7,500 and $9,200; that it received annual rents of between $8,400 and $12,400; and that it received "other income" averaging approximately $72,000 per year from collections on charged-off accounts, purchase and trade discounts and other adjustments. Petitioner realized losses aggregating $2,500 on the sale of 11 pieces of unimproved real estate during its fiscal year 1939 and sustained capital losses in excess of $2,000 on the disposition of other properties in the same year for which it has been allowed a deduction of $2,000. The description, location, date of acquisition and the losses sustained on the respective properties are as follows: Acquisition
Loss
Description and Location
Date
Manner
Sustained
Lots in Melin's Rearrangement, South St.
Paul, Minn.
Lot 2, Block 1
Sept. 19, 1919
Purchased
$ 150.00
Lot 8, Block 1
Sept. 19, 1919
Purchased
125.00
Lot 11, Block 1
Sept. 19, 1919
Purchased
150.00
Lot 5, Block 2
Sept. 19, 1919
Purchased
150.00
Lots in Crosby Addition, Minneapolis, Minn.
Lots 12 & 13, Block 1
Aug. 27, 1930
Settlement of acct
900.00
Lot 7, Block 2
Aug. 27, 1930
Settlement of acct
250.00
2nd Railway Addition, South Sioux City,
Nebraska
Lots 1 & 2, Block 10
Sept. 21, 1926
Settlement of act
none
SE 1/4 of SW 1/4, 34-136-106, Golden Valley
Co., No. Dak
Apr. 10, 1930
By foreclosure
none
Closed plant site, Englevale, No. Dakota
Apr. 28, 1928
Purchased
25.00
Closed plant site, Hurdsfield, No. Dakota
June 11, 1921
Purchased
500.00
Closed plant site, Mayville, No. Dakota
Apr. 17, 1926
Purchased
250.00
Total
$2,500.00
*400 The lots in Melin's Rearrangement were acquired by purchase as a single tract in September, 1919, so that petitioner could subdivide the tract, improve it with houses and sell them. It built houses on some of the lots and sold them. The purchase of this property was made in order to increase the sale of lumber and promote building. The Englevale, Hurdsfield and Mayville, North Dakota, properties had been acquired, held and used by petitioner as lumber yards. The three other properties sold in the fiscal year 1939 were acquired in settlement of accounts owing to petitioner for lumber sold by it. One of petitioner's employees named Wilcox, in the period from 1924 to 1929, spent practically all of his time on real estate matters and from thereafter until 1939, he spent at least one-half of his time on such matters. During the earlier period he was a special auditor. He started work for petitioner at Billings, Montana, devoting his time to an accumulation of accounts, many of which had been accounts of some 12 or 15 yards which had been closed. His work in that territory was devoted to the collection of accounts, exchanges and sales of real estate, and renting and improving real estate. *401 In many of the accounts they accepted real estate in payment, in others they took security in the form of mortgages. There were also a few contracts for deeds which developed into ownership. It was the acquisition of real estate, its repair and disposal that occupied practically all of Wilcox's time in that territory. From Billings Wilcox went to Sioux City, Iowa, where petitioner had six or seven yards. In Sioux City he did substantially the same things as he had done at Billings but on a larger scale because petitioner had more properties in Sioux City by reason of defaults of one kind or another. In Sioux City there was a substantial suburban development by one Todd which resulted in petitioner's taking over a dozen or so of his properties to clean up his account for lumber and material furnished him. He also did similar work for petitioner in North Dakota, Minnesota, South Dakota, and at other points where petitioner had divisional offices. During the period 1924 to 1939 Wilcox, in his attempts to dispose of the properties, operated only through petitioner's organization and not through real estate agents or brokers except in a few instances in cities such as St. Paul and Sioux *402 City, where the agents were used solely to find satisfactory customers, petitioner handling the mechanics of the sale through its own organization. Petitioner's employees were paid no commission for the disposition or handling of real estate. Petitioner's treasurer, one Nolan, was Wilcox's superior. Wilcox had conferences-with Nolan on real estate matters and prior to Nolan's death in June, 1942, approximately 50 percent of his time was spent on matters relating to petitioner's real estate. T. B. Anderberg has been manager of petitioner's Aberdeen division and in charge of 57 lumber yards in North and South Dakota and Moorehead, Minnesota. He was manager of the yard at Aberdeen as well as division manager. From 25 percent to 33 1/3 percent of his time has been devoted to real estate matters and 15 percent to 25 percent of the time of his assistant, four superintendents, and a credit man was similarly expended. A large part of the property in his division was rented pending disposition by sale in a favorable market. Petitioner had no properties in its Aberdeen division which resulted in considerable profit from rentals. Petitioner's assistant secretary and assistant treasurer, S. *403 A. Fisher, spent from 30 percent to 50 percent of his time in real estate activities. Fisher's and Nolan's offices were in St. Paul. From December 31, 1924, to November 30, 1939, petitioner acquired 221 parcels of real estate other than yards. Of these properties 44 were acquired through settlement of accounts or mortgages, 13 were acquired through foreclosure of mortgages, 75 were acquired by purchase, and the balance were acquired through exchanges and repossession under defaulted contracts. Of these 221 parcels, 183 were sold between December 31, 1924, and November 30, 1939. During the years 1927 to 1939, inclusive, petitioner at various times rented some 42 to 123 parcels of real estate from which it collected substantial rentals and expended substantial sums for taxes, insurance, repairs, and interest. Such operations resulted in net losses for all years except 1935. Petitioner's intention was to rent such properties pending sale at its price. Petitioner sometimes furnished a contractor with money to purchase lots. For the period from December 31, 1924, to November 30, 1939, inclusive, petitioner was a party to 985 contracts for deeds. In each year during that period petitioner *404 has been mortgagee on real estate in amounts varying from $750 to $44,500. As part of its operation petitioner acquired a subdivision in Sioux City in settlement of its account. It thereafter sold the lots comprising the subdivision. For the years 1915 to 1939, inclusive, petitioner acquired at least the following number of properties: Year
Tracts Acquired
1915
16
1916
4
1917
3
1918
8
1919
12
1920
21
1921
3
1922
15
1923
6
1924
16
1925
6
1926
6
1927
8
1928
14
1929
10
1930
4
1931
7
1932
7
1933
6
1934
3
1935
2
1936
5
1937
7
1938
0
1939
1
For the years 1925 to 1939 petitioner sold at least the following number of properties: Year
Tracts Sold
1925
29
1926
14
1927
5
1928
7
1929
11
1930
9
1931
8
1932
5
1933
5
1934
5
1935
33
1936
12
1937
9
1938
9
1939
8
Petitioner's properties which were sold during 1939, as above listed, were not held by it primarily for sale to customers in the ordinary course of its trade or business. Opinion Like many such controversies, this proceeding presents the difficulty of drawing a line in a field involving situations which at both extremes are clear enough, but which merge toward the center into *405 a region of relative obscurity. The sale by petitioner of several parcels of its real estate gave rise to a loss, the deductibility of which depends upon whether the property was held by it for sale to customers in the ordinary course of its business. It seems to be assumed that the properties were held primarily for sale, and the problem is whether under the circumstances shown by this record petitioner was engaged in a business of such a nature as to justify the conclusion that these sales took place in its ordinary course. Revenue Act of 1938, section 117. It seems to be clear that the sales in question need not be made in pursuit of the taxpayer's sole or even of its principal business: Neils Schultz, 44 B.T.A. 146, dismissed (C.C.A., 9th Cir.), 123 Fed. (2d) 1020; A. R. Calvelli, 43 B.T.A. 6; Julius Goodman, 40 B.T.A. 22; and possibly that the transactions may be so incidental as to include the sale of property acquired in foreclosure by taxpayers whose principal business is the making of loans secured by such property. G.C.M. 21497, 1939-2 C.B., 187; *406 I.T. 3336, 1939-2 C.B., 189. On the other hand, occasional, isolated or casual transactions are not sufficient to furnish the frequency and continuity required to constitute the ordinary course of business. Phipps, et al., v. Commissioner (C.C.A., 2nd Cir.), 54 Fed. (2d) 469; see Ehrman v. Commissioner (C.C.A., 9th Cir.), 120 Fed. (2d) 607. Were this a case of first impression, there might be some impulse to conclude that one engaged in the lumber business, as this petitioner was, in the course of which property from time to time acquired in settlement of accounts was sold as occasion permitted, would fall preponderantly on the same side of the line as taxpayers engaged in making loans and selling the security upon foreclosure. But the decision would at best be a close one, and the rule itself not free from doubt. Of the greatest significance, however, is the fact that the matter is no longer undecided. In Thompson Lumber Co., 43 B.T.A. 726, the Board was required to pass on the same question as is now before us, in the case of a lumber company which had *407 acquired properties in discharge of indebtedness to it, the sale of which resulted in losses similar to those shown here, and concluded that the properties in question were not held by the taxpayer for sale to customers in the ordinary course of its business. In principle, we think this disposes of the basic question presented in this proceeding. An attempt is made by petitioner to distinguish that case on several grounds, but each leaves us with the view that the distinctions relate to insignificant evidentiary facts and fail to effect the result. They stem primarily from language used in the Thompson case, where the Board said in part (pp. 729-731): Petitioner's principal business was buying and selling lumber, building materials, air conditioning equipment, and similar property. According to its income tax returns its gross sales of such materials at its three yards aggregated approximately three-quarters of a million dollars annually. The testimony * * * indicates that the acquisition of real estate was only incidental to its lumber and material business. * * * Petitioner points out that its corporate charter empowers it to acquire, hold, and dispose of all kinds of real *408 estate. Whether this power is merely incidental to its lumber and material business or whether it authorizes it to conduct a general real estate business is probably immaterial. In our opinion the evidence fails to show that it was engaged in the real estate business to any extent. It never purchased real estate for the purpose of selling it at a profit. * * * True it occasionally sold a piece of real estate; but it is interesting to note that in most, if not in all, of the sales made by it during the taxable years the usual real estate agent's commission was paid * * *. Whether the ruling [G.C.M. 21497, I.T. 3336, supra] is correct or not need not be decided. It suffices to point out that petitioner, * * * did not maintain a real estate department and was not actively engaged in buying and selling real estate. As pointed out above, it made no purchases of such property for sale to customers. Its real estate (other than lumber yards) appears to have been acquired solely for the purpose of minimizing or preventing loss upon lumber and building materials sold by it. The time devoted by petitioner's officers and employees to disposing of its real estate was infinitesimal in comparison *409 with the time devoted to the lumber or material business. * * * * * * Petitioner has failed to show that it was in the business of selling its lands. * * * In reaching this conclusion we have not overlooked the testimony to the effect that petitioner, after acquiring the various properties, endeavored to sell them, placed for sale signs upon them, advertised them in the papers, listed them with various real estate agents, and furnished lists of them to its own officers and agents. This evidence, though no doubt showing a bona fide effort to dispose of the property, falls far short of proving that petitioner was in the real estate business or that the property was held as prescribed by the statute. * * * Considering the relative size of the two enterprises and that petitioner's business was approximately four times that of the taxpayer in the Thompson case, the various distinctions based upon the relative magnitude of real estate operations are unconvincing. Thus, it is not significant that in the Thompson case an average of 36 parcels was held at one time, whereas here 221 parcels had been acquired over a 15-year period; nor that in the Thompson case 8 tracts were *410 sold in one year and 2 in another, whereas here the sales were 21, 13, and 11 in the three years in controversy. And finally the amount of time apparently devoted to real estate activities by petitioner seems as "inconsequential" by comparison as it appears in the Thompson case, for here 10 employees out of approximately 300 are said to have devoted from 15 to 50 percent of their time to real estate matters, including upkeep and rental as well as sale, the result being somewhere in the neighborhood of 1 percent of the total. We are as little moved by the suggestion that in the Thompson case the petitioner never purchased real estate for resale, never engaged in any subdividing or development, listed its property with agents, and paid agents commissions on the sales. The present petitioner listed some of its properties with agents and presumably paid some commissions; and in the Thompson case, some sales apparently were made without the intervention of others. As for the implication that this petitioner bought property for resale, and engaged in the business of subdividing and selling, the nearest approach to this shown by the record is that certain property was bought *411 and subdivided 20 years earlier in 1919; and it is not apparent that in more recent years and particularly in those before us any business activity other than casual sales took place in that respect. As to this, to borrow the language of Phipps, et al., v. Commissioner, supra: * * * if, to diversify their holdings, they buy land, with the expectation of selling it when a good price is offered, such an expectation cannot, in our opinion, convert some sales of land that had been held for seven or eight years into a trade or business in real estate. * * * There was during the years in question no activity amounting to a trade or business within the meaning of the statute, and whether there was such a trade or business depended on the situation of the taxpayers at the time of the sale. They had not continuously engaged in the development and sale, or the purchase and sale of lands. The parcels sold in the year before us fall into three general classes as to their origin. Some were acquired by settlements of accounts or foreclosure. Some were originally devoted to lumber yard purposes, and sold when their usefulness disappeared. The remaining parcels consisting *412 of 4 lots were those purchased in 1919, and apparently held during all of the interval. Only the latter could possibly represent properties originally purchased for resale. The circumstances already described do not seem to us to warrant the conclusion that these facts are sufficiently different from those in the Thompson case, or that these insignificant transactions originating many years previously furnish the frequency and continuity necessary to constitute a business of buying properties for resale and disposing of them to customers. On the authority of the Thompson case we have accordingly found that the properties in question were not held by petitioner for sale in the ordinary course of its business and are, therefore, capital assets. Decision will be entered for respondent. Footnotes
1. SEC. 117. CAPITAL GAINS AND LOSSES. (a) Definitions. - As used in this title - (1) Capital Assets. - The term "capital assets" means property held by the taxpayer (whether or not connected with his trade or business), but does not include stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business, or property, used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 23(1).↩